**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| LOUISE TRAUMA CENTER, LLC | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 20-3517 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 14, 17 |
| | : | | |
| DEPARTMENT OF JUSTICE, | : | | |
| | : | | |
| Defendant. | : | | |

<u>**MEMORANDUM OPINION**</u>

Denying Plaintiff's Motion for Summary Judgment; Granting in Part and Denying
in Part Defendant's Cross-Motion for Summary Judgment

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Louise Trauma Center, LLC ("the Center") is a nonprofit organization dedicated to

helping immigrant women who have experienced gender-based violence apply for asylum, as

well as educating the public and raising awareness about the issues their clients face.  Compl.

¶ 4, ECF No. 1.  In furtherance of that work, the Center made a series of FOIA requests to the

Department of Justice in 2019 and 2020 that formed the basis of this six-count action.  *See id.*

¶¶ 8, 15, 20, 25, 34, 42.  Following the filing of this FOIA action in December 2020, *see*

*generally id.*, the government processed all six requests and the parties conferred regarding their

outstanding disagreements.  *See* Joint Status Reports, ECF Nos. 10, 11, 12, 13, 15.  As a result,

only two of the counts in the Complaint now require resolution by the Court: Counts 2 and 4.

*See* Pl.'s Mot. Summ. J. at 4 ("Pl.'s Mot."), ECF No. 14.

The FOIA request in Count 2 was submitted in September 2019 and requested "all

records . . . concerning Office of Immigration Litigation training materials for lawyers in the

appellate section[.]"  Ex. 2 of Compl., ECF No. 1-2; *see also* Pl.'s Statement Facts ¶¶ 2–3 ("Pl.'s

St. Facts"), ECF No. 14-1; Def.'s Statement Facts ¶ 1b ("Def.'s St. Facts"), ECF No. 17-1.  DOJ

had not yet responded to the request when this action was filed over a year later.  Pl.'s St. Facts

¶ 6; Def.'s Resp. to Pl.'s Statement Facts ¶ 6, ECF No. 16-1.  The Office of Immigration

Litigation Appellate Section (OIL-App) began searching for responsive documents in January

2021 and located 4,363 responsive pages.  Decl. of Hirsh Kravitz ¶ 7 ("Kravitz Decl."), ECF No.

17-2; Supp. Decl. of Hirsh Kravitz ¶ 7 ("Supp. Kravitz Decl."), ECF No. 21-1.  Of those, DOJ

released 172 pages in full, released 24 pages with redactions, and withheld 4,168 pages and 12

videos in full pursuant to FOIA Exemptions 5 and 6.  Def.'s St. Facts ¶ 8.  The Center believes

that the government improperly asserted Exemption 5 to withhold documents responsive to that

request.  Pl.'s Mot. at 6.

The request at issue in Count 4 was submitted in May 2020.  Def.'s St. Facts ¶ 13.  It first

referenced the foreseeable harm standard incorporated into statute by the FOIA Improvement

Act of 2016, which required agencies to only withhold information if "the agency reasonably

foresees that disclosure would harm an interest protected by an exemption."  Ex. 4 of Compl.,

ECF No. 1-4; *see also* FOIA Improvement Act of 2016, Pub. L. No. 114-185 (codified at 5

U.S.C. § 552(a)(8)(A)(i)(I)).  The request then posed the questions: "How are you able to foresee

that harm will result if a particular document is disclosed? What information do you rely upon?"

and requested "a copy of all records concerning: 'studies, analyses, research, memoranda,

information, instructions, reports, and documents concerning the harm mentioned above[.]'"  Ex.

4 of Compl.

Similar requests were sent to DOJ's Executive Office for U.S. Attorneys and Office of

Information Policy and were reflected in the fifth and sixth causes of action.  *See* Def.'s Cross

Mot. Summ. J. at 13 ("Def.'s Cross Mot."), ECF No. 17; Compl. ¶¶ 33, 41.  OIP, which was the

proper entity to receive that request, responded by providing a link to a formerly processed request on the same topic available on the agency's FOIA website along with six redacted pages. *See* Joint Status Report ¶ 8, ECF No. 13 (May 6, 2021).  The Center no longer objects to the response to those requests, only to the request processed by the Civil Division and referenced in Count 4.  Compl. ¶¶ 25–26; Pl.'s Mot. at 10.

Despite maintaining that OIP, rather than the Civil Division, was the proper entity to process this request, the Civil Division also conducted a search of its T Drive, which is "where all cases, documents, records, guidance, and templates are maintained related to the processing of FOIA requests."  Kravitz Decl. ¶ 5.  The Civil Division provided a final response to the Center in January 2021, advising it that no responsive records could be located.  *See* Ex. 8 of Def.'s Cross Mot., ECF No. 17-8; Joint Status Report ¶ 7b, ECF No. 13 (May 6, 2021).

The Center has filed its motion for summary judgment on the remaining two requests at issue.  *See* Pl.'s Mot.  DOJ has opposed, *see* Def.'s Opp'n to Pl.'s Mot. Summ. J. ("Def.'s Opp'n"), ECF No. 16, and filed its own cross-motion for summary judgment, *see* Def.'s Cross Mot.  For the reasons below, the Court will deny the Center's motion and will grant in part and deny in part DOJ's cross-motion.

## II.  ANALYSIS

### A.  Legal Standard

The Freedom of Information Act is meant "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  Accordingly, the FOIA statute "directs that 'each agency, upon any request for records . . . shall make the records promptly available to any person' unless the requested records fall within one of the

statute's nine exemptions." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting 5

U.S.C. § 552(a)(3)(a)).  "The agency bears the burden of establishing that a claimed exemption

applies[,]" *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1088 (D.C.

Cir. 2014), and exemptions are "given a narrow compass[,]" *U.S. Dep't of Just. v. Tax Analysts*,

492 U.S. 136, 151 (1989).

"FOIA cases typically and appropriately are decided on motions for summary judgment."

*Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing *Bigwood v.

U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007)).  Summary judgment is

warranted where "the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact

is one capable of affecting the substantive outcome of the litigation.  *See Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is enough evidence for a

reasonable jury to return a verdict for the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 380

(2007).

To prevail on a motion for summary judgment in a FOIA case, "the defending agency

must prove that each document that falls within the class requested either has been produced, is

unidentifiable or is wholly exempt from the Act's inspection requirements."  *Weisberg v. U.S.

Dep't of Just.*, 627 F.2d 365, 368 (D.C. Cir. 1980) (internal quotation marks omitted) (quoting

*Nat'l Cable Television Ass'n v. FCC*, 479 F.2d 183, 186 (D.C. Cir. 1973)).  A court "may award

summary judgment solely on the basis of information provided by the department or agency in

declarations when the declarations describe 'the documents and the justifications for

nondisclosure with reasonably specific detail, demonstrate that the information withheld

logically falls within the claimed exemption, and are not controverted by either contrary

evidence in the record nor by evidence of agency bad faith.'" *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Lab.*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).  An agency's justification for withholding records "is sufficient if it appears 'logical' or 'plausible.'" *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Wolf v. C.I.A.*, 473 F.3d 370, 375 (D.C. Cir. 2007)); *Pinson v. U.S. Dep't of Just.*, No. 12-cv-1872, 2016 WL 29245, at *10 (D.D.C. Jan. 4, 2016).  Review is *de novo*, 5 U.S.C. § 552(a)(4)(B), but a reviewing court should "respect the expertise of an agency" and not "overstep the proper limits of the judicial role in FOIA review[,]" *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979).

### B. Count 2: Request for Appellate Training Materials

The FOIA request in Count 2 sought "all records . . . concerning Office of Immigration Litigation training materials for lawyers in the appellate section[.]"  Ex. 2 of Compl.  The responding division, OIL-App, located 4,364 responsive pages, of which the Civil Division released 172 pages in full, released 24 pages with redactions, and withheld 4,168 pages and 12 videos pursuant to FOIA Exemptions 5 and 6.[1]  Def.'s St. Facts ¶ 7–8; Kravitz Decl. ¶ 7–8.

DOJ provided a *Vaughn* Index grouping the various withheld documents into five categories that contain hundreds of pages each: 2019 May Asylum Training, 2019 Annual Fall Conference, 2020 Annual Fall Conference, 2019 New Attorney Training, and 2020 New Attorney Training.  *See generally* Ex. 3 of Def.'s Cross Mot. ("Index"), ECF No. 17-3.  The

---

[1] The Center does not contest DOJ's reliance on Exemption 6.  The Court also notes, however, that it is impossible to tell which documents are being withheld pursuant to Exemption 6 and which pursuant to Exemption 5, and it expects DOJ to rectify that shortcoming in its next submission.

Index also contained the following more detailed descriptions of the responsive training materials from each event:

- Category 1: The materials from the two-day May 2019 Asylum training on the topic of "Asylum and Withholding after Matter of A-B" include "in-depth descriptions of training sessions and how to litigate or treat cases under new case laws[,]" as well as a cover page, practice hypotheticals, a presentation on the Attorney General's precedential asylum decision in *Matter of A-B-* and its application to current cases.  Index at 1.  The Index also lists several key concepts of asylum law, such as the element of persecution, formulation of particular social groups, motive nexus, and "statute and case requirements[,]" which were presumably the topics of various panels and whose application in future cases was described.  *Id.*

- Categories 2 & 3: OIL-App's 25th and 26th Annual Immigration Law Seminars, held in fall 2019 and 2020, produced a large number of documents of which DOJ fully withheld 2,075 pages and 1,147 pages, respectively.[2]  Index at 1, 3.  The materials for each included "in-depth descriptions of trainings and litigating cases, [and] guidance on how to proceed with potential cases[.]"  *Id.*  The Index lists a range of different topics for each conference.  Although the topics at each vary,

---

[2] DOJ also partially withheld 11 pages from the 2019 seminar and 7 pages from the 2020 seminar.  Index at 1, 3.  It is not possible to tell from the Index which documents were withheld in full and which ones were released in part, but at least a few of the partially released documents were the agendas for the various trainings, attached as Ex. 2 to the Center's Motion for Summary Judgment.  *See* Ex. 2 of Pl.'s Mot., ECF No. 14-2.  The Kravitz Declaration mentions the agendas, saying that "[t]he Civil Division determined that it was able to reveal the Agendas (showing the title and faculty) of each training session . . . in order to demonstrate that the participants and content are within the [asserted privileges.]").  Kravitz Decl. ¶ 11.

they appear to cover a range of practical and substantive guidance ranging from "asylum regulations and policies and their implications for OIL litigations" to simply "monographs on immigration law[.]"  Index at 2–4.

- Categories 4 & 5: The descriptions of the 2019 and 2020 New Attorney Training Materials are in part identical.  The entirety of the 2019 description and the first part of the 2020 description both list "coding of OIL documents; how cases are assigned internally and internal appearance information for handling cases; internal checklist for handling cases and issues in cases, filings; court and OIL processes for cases handled by circuit counselors and internal information on types of cases; internal passwords and procedures for tracking cases; internal procedures for tracking time and hours spent on cases[.]"  Index at 4.  The 2020 New Attorney Training materials also include a longer list of topics that largely constitute the nuts and bolts of immigration appellate litigation, such as "training on issue spotting and brief writing[,]" "suggestions on best practices for reviewing administrative records[,]" "origin of asylum and withholding of removal with legal elements and credibility[,]" "discussion of DHS removal procedures[,]" "how to apply automatic temporary stays[,]" and "judicial review in the Court of Appeals[,]" to give just a sample.  *Id.* at 5.

DOJ bears the burden of justifying its withholding of the responsive documents.  *See* 5 U.S.C. § 552(a)(4)(B); *Nat. Res. Def. Council, Inc. v. Nuclear Regul. Comm'n*, 216 F.3d 1180, 1190 (D.C. Cir. 2000).  "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible[,]'" *Scudder v. CIA*, 254 F. Supp. 3d 135, 140 (D.D.C. 2017) (quoting *Judicial Watch*, 715 F.3d at 941), but "statutory exemptions are 'narrowly

construed[,]'" and "[w]ithholding information under conclusory, generalized, or sweeping allegations of exemptions is not acceptable[,]" *Elec. Priv. Info. Ctr. v. U.S. Drug Enf't Agency*, 192 F. Supp. 3d 92, 101, 103 (D.D.C. 2016) (quotations omitted).  Exemption 5 of FOIA covers "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]"  5 U.S.C. § 552(b)(5).  It protects documents that would be privileged in ordinary civil litigation.  *See Loving*, 550 F.3d at 37; *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863–64 (D.C. Cir. 1980).

DOJ relies on the deliberative process privilege, attorney work product privilege, and attorney-client privilege[3] to justify its withholdings under Exemption 5 for all 4,168 pages and 12 videos that it withheld in all five categories.  Although the agency has provided a *Vaughn* Index, the information provided is insufficient to allow the Court to make a *de novo* determination about the appropriateness of the withholdings.  A *Vaughn* Index is supposed to "correlate statements made in the Government's refusal justification with the actual portions of the document[,]" *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973), but DOJ's Index fails to sufficiently do so.  The Court cannot discern from the information provided which documents are exempt under which categories, and the limited information provided suggests that it is unlikely "that all of the information is equally exempt under all of the alleged exemptions."[4]  *Id.* at 827–28.

---

[3] The Center states in its Statement of Undisputed Facts that DOJ disclaimed its prior reliance on the deliberative process and attorney-client privileges.  Pl.'s St. Facts ¶¶ 13–14.  DOJ directly denies this, *see* Def.'s Resp. Pl.'s St. Facts ¶¶ 12–13, and has identified all three privileges in its *Vaughn* Index and the Kravitz Declaration, *see* Exs. 1–2 of Def.'s Mot.  The Court will therefore analyze all three privileges.

[4] The Court points out that proper labeling of which privilege corresponds to which document takes on an added level of importance now that FOIA also requires agencies to release information only if "the agency reasonably foresees that disclosure would harm an interest protected by an exemption[,]" 5 U.S.C. § 552(a)(8)(A)(i)(I), given that the interests protected by

The Court will address for each asserted privilege how DOJ has fallen short of its burden. However, the Court will deny summary judgment to either party and allow DOJ another opportunity to meet its burden.

### 1. Attorney Work Product Privilege

The attorney work-product doctrine "provides a working attorney with a 'zone of privacy' within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories." *Coastal States*, 617 F.2d at 864. To be privileged under the attorney work product doctrine, the document must have been "prepared in contemplation of litigation, or in the course of preparing for trial." *Id.* at 865. For an agency to meet its burden of showing attorney work-product doctrine applies to a given document, "it must (1) provide a description of the nature of and contents of the withheld document, (2) identify the document's author or origin, (3) note the circumstances that surround the document's creation, and (4) provide some indication of the type of litigation for which the document's use is at least foreseeable." *Ellis v. U.S. Dep't of Just.*, 110 F. Supp. 3d 99, 108 (D.D.C. 2015), *aff'd*, No. 15-5198, 2016 WL 3544816 (D.C. Cir. June 13, 2016). "[W]e ask whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *E.E.O.C. v. Lutheran Soc. Servs.*, 186 F.3d 959, 968 (D.C. Cir. 1999) (cleaned up) (emphasis added); *see also Nat'l Ass'n of Crim. Def. Laws. v. Dep't of Just. Exec. Off. For United States Att'ys* [hereinafter "*Nat'l Ass'n*"], 844 F.3d 246, 251 (D.C. Cir. 2016) ("In ascertaining whether a document was prepared in anticipation of litigation, we have applied a 'because of' test, asking whether, in light of the

---

the three privileges asserted here are distinct and may not apply with equal force to all documents within a large group.

nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.") (quotations omitted).

The work product privilege "extends to documents prepared in anticipation of foreseeable litigation, even if no specific claim is contemplated." *Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C. Cir. 1992), *abrogated on other grounds by Milner v. Dep't of Navy*, 562 U.S. 562 (2011). As the name implies, the attorneys in DOJ's Office of Immigration Litigation, Appellate Division become involved when there is an appeal of an immigration case, making future litigation not only foreseeable, but a certainty.  Still, FOIA exemptions "must be 'narrowly construed[.]'"  *Milner*, 562 U.S. at 565 (quotation omitted).  To that end, this Circuit has therefore "drawn a line between 'neutral, objective analyses of agency regulations' and 'more pointed documents' that recommend 'how to proceed further with specific investigations' or 'advise the agency of the types of legal challenges likely to be mounted against a proposed program, potential defenses available to the agency, and the likely outcome.'"  *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 905 F. Supp. 2d 206, 221–22 (D.D.C. 2012) (quoting *Delaney, Migdail & Young, Chartered v. IRS*, 826 F.2d 124, 127 (D.C. Cir. 1987)).

DOJ likens its training materials to the latter category of documents that "advise the agency of the types of legal challenges likely to be mounted against a proposed program, potential defenses available to the agency, and the likely outcome."  Def.'s Cross Mot. at 7–8 (quoting *Delaney*, 826 F.2d at 127).  But nothing in the Index discusses a DOJ policy or program that might be challenged, rather, the potential litigation DOJ alludes to appears to be appeals of routine removal cases.  *See, e.g.*, Index at 2 ("analysis to determine when convictions trigger immigration consequences"); *id.* at 3 ("discussion on political opinion claims"); *id.* at 5

("identifying issues in reasonable fear cases").  That is undoubtedly litigation, but of a different variety than trying to anticipate the potential "legal vulnerabilities" of an agency program.  *See Delaney*, 826 F.2d at 127.  Explanation of the elements of the relevant law the agency deals with on a day-to-day basis may potentially be closer in some portions of the materials to the "agency manual, fleshing out the meaning of the statute it was authorized to enforce" that the cited portion of *Delaney* distinguished from.  *See id.*

On one hand, the D.C. Circuit has in some instances found materials designed to guide "attorneys on one side of an adversarial dispute" on "how to respond to the other side's arguments, which cases to cite, and what material to turn over and when to do so, among numerous other practical and strategic considerations" to be protected by the attorney work product privilege.  *Nat'l Ass'n*, 844 F.3d at 255 (holding that "an internal manual containing litigation strategies" for prosecutors was protected attorney work product); *see also Schiller*, 964 F.2d at 1208 (memos with "instructions on preparing and filing pleadings in EAJA cases, including arguments and authorities" would be "prepared in anticipation of litigation" such that they fall within the scope of the attorney work product privilege).  In doing so, the Circuit has affirmed that privileged material need not correspond to a specific claim if its "disclosure . . . risks revealing DOJ's litigation strategies and legal theories regardless of whether it was prepared with a specific claim in mind."  *Nat'l Ass'n*, 844 F.3d at 254.  It is possible, based on the listed descriptions, that many of the training materials provide strategy in furtherance of OIL-App's "adversarial function," much like the litigation guide for federal prosecutors at issue in *Nat'l Ass'n* or the guidance memos at issue in *Schiller*.

But courts within and beyond this Circuit have cautioned against applying the reasoning of *Schiller* and *Nat'l Ass'n* too broadly.  *See Nat'l Ass'n*, 844 F.3d at 259 (Sentelle, J.,

concurring) (conceding that precedent in *Schiller* exempted the prosecutorial litigation guide in *Nat'l Ass'n* as protected attorney work product, but expressing reservations that "applying the broad construction of *Schiller* to the case before us is inconsistent both with the statutory purpose of FOIA and the longstanding values of justice in the United States"); *see also Shapiro*, 969 F. Supp. 2d at 34 ("The 'prospect of litigation' cannot be read over-broadly to be so divorced from any specific legal claim such that it renders this fundamental criterion for invocation of the work product doctrine meaningless."); *ACLU of San Diego & Imperial Cntys. v. U.S. Dep't of Homeland Sec.*, No. 8:15-cv-00229, 2017 WL 9500949, at *9 (C.D. Cal. Nov. 6, 2017) ("[*Nat'l Ass'n*] represents the outer reaches of Exemption 5's reformulation of the work product privilege.").  In other words, any training for agency litigators is in some sense "in anticipation of litigation" and has an "adversarial function," *see Nat'l Ass'n*, 844 F.3d at 250, 255, but taken too far, that interpretation risks running afoul of the bedrock mandate to construe FOIA exemptions narrowly, *see F.B.I. v. Abramson*, 456 U.S. 615, 630 (1982).

The concern articulated in *Nat'l Ass'n* that disclosure of the manual would "risk[] revealing DOJ's litigation strategies and legal theories" serves as a helpful limiting principle in situations like this one.  *See Nat'l Ass'n*, 844 F.3d at 254.  Although many of the documents described in the *Vaughn* Index are likely protected, DOJ's broad assertions do not do enough to convince the Court that every withheld document would risk revealing protected litigation strategy or legal theory.  At least some of the items listed in DOJ's *Vaughn* Index seem closer to the "neutral, objective analyses" of the relevant law that is not protected.  *See Coastal States*, 617 F.2d at 863; *see, e.g.*, Index at 1 ("A-B case holding presentation"); *id.* ("statute and case requirements when litigating cases"); *id.* at 2 ("federal power over immigration discussion"); *id.*

at 3 ("discussion on political opinion claims").  Based on the record, the Court cannot determine on which side of the line each document falls.

The Court is especially skeptical of DOJ's assertion of the attorney work product privilege for the 2019 New Attorney training (Category 4) and the first section of the 2020 New Attorney Training (Category 5).  The relevant documents in each discuss "coding of OIL documents; how cases are assigned internally and internal appearance information for handling cases; internal checklist for handling cases and issues in cases, filings; court and OIL processes for cases handled by circuit counselors and internal information on types of cases; internal passwords and procedures for tracking cases; internal procedures for tracking time and hours spent on cases[.]"  Index at 4.  Those topics are "literally 'in anticipation of litigation'" in the sense that they teach new agency lawyers how to manage their cases, but they do not "anticipate litigation in the manner that the privilege requires."  *Am. Immigr. Council*, 905 F. Supp. 2d at 222.  Unlike the training materials in the other categories that could at least potentially relate to developing strategy for a specific case, the new attorney training materials for both 2019 (and the first part of the 2020 list) discuss purely administrative issues.  Index at 4.  Those documents are more akin to the series of slides that taught "employees how to interact with private attorneys during USCIS proceedings before adjudicators" in *Am. Immigr. Council*.  *Am. Immigr. Council*, 905 F. Supp. 2d at 222.  The fact that the information in those slides, and the new attorney training materials here, "happen[s] to apply in agency litigation" does not bring it within the scope of the work product privilege.  *Id.*  It is possible that some of these pages may qualify for the attorney work-product privilege, but the agency's broad-brush approach makes it impossible to say.

*a. Segregability*

"[I]f the government can segregate and disclose non-privileged factual information within a document, it must." *Loving*, 550 F.3d at 38.  DOJ's conclusory, across-the-board assertions of privilege suggest that the agency has not sufficiently attempted to do so here.  Rather, DOJ argues that segregability is *never* required when the attorney work-product privilege is asserted, and that because it has asserted that privilege over all 4,168 pages and 12 videos,[5] it need not conduct segregability analysis for any of them.  Def.'s Cross Mot. at 10–11.  It is true that where the withheld document "is fully protected as work product, then segregability is not required." *Jud. Watch, Inc. v. Dep't of Just.*, 432 F.3d 366, 371 (D.C. Cir. 2005).  But there must be something more than the agency's conclusory labeling of a document as attorney work product to establish that the document is in fact "fully protected" as such.  *Id.*

Segregability under other privileges, such as the deliberative process privilege, usually turns on whether responsive material is fact or analysis, whereas "factual elements can 'seldom' be segregated from attorney work product." *Martin v. Off. Of Special Couns., Merit Sys. Prot. Bd.*, 819 F.2d 1181, 1186 (D.C. Cir. 1987) (quotation omitted).  But "seldom" is not "never." Facts can rarely be separated from analysis in typical attorney work product because most attorney work product involves analyzing concrete facts as they relate to a specific claim.  The fact/analysis division is less helpful here, where at least some of the analysis in the training materials appears to apply to generalized or hypothetical facts.  *See Shapiro*, 969 F. Supp. 2d at

---

[5] The Court also directs DOJ's attention to the Circuit's recent admonition that government agencies should consider and utilize available video editing technologies when conducting segregability analysis of video materials.  *See Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 587 (D.C. Cir. 2020) ("[W]e live in an era in which teenagers regularly send each other screenshots from all sorts of video media.  Presumably, most of these teenagers have fewer resources than the United States government.").

30 (noting the "unique challenges" of determining the scope of attorney work product "in circumstances where the materials, as here, were not created for the purposes of a specific litigation or even for a particular claim that might arise in multiple cases").

And as the Center points out, *see* Pl.'s Reply at 11–12, a categorical application of that rule is inappropriate where the privilege is asserted over a large document or category of documents that may contain non-privileged material. *See Nat'l Ass'n*, 844 F.3d at 256–57 ("In cases involving voluminous or lengthy work-product records—the Blue Book is more than 500 pages in length—we think it generally preferable for courts to make at least a preliminary assessment of the feasibility of segregating nonexempt material."); *Shapiro*, 969 F. Supp. 2d at 35 (rejecting an agency's blanket assertion of the work-product privilege over an entire brief bank designed as a resource in foreseeable, but undefined, future litigation); *ACLU of San Diego & Imperial Cntys.*, 2017 WL 9500949, at *9–10 (ordering release of some portions of a law enforcement course book where some of the chapters contained more pointed guidance and others contained more neutral descriptions of the law). The training materials here in many instances appear to apply the law to hypothetical or generalized scenarios, or include at least large sections that are "neutral, objective analyses" of the relevant law that is not privileged. *Coastal States*, 617 F.2d at 863. DOJ should therefore evaluate in its second opportunity whether each document is in fact "*fully* protected as work product," *Jud. Watch*, 432 F.3d at 371 (emphasis added), or whether it contains more neutral and educational portions that could be partially released.[6]

---

[6] Because DOJ's reading of this Circuit's precedent on segregability of attorney work product is overly rigid and some of the materials in this case might well be an exception to the general rule, the Court need not and does not consider whether the FOIA Improvement Act of 2016 imposed heightened segregability requirements on government agencies. *See* Pl.'s Mot. at 9; Def.'s Mot. at 11–12.

2.  Deliberative Process Privilege

The deliberative process privilege "protect[s] agencies from being 'forced to operate in a fishbowl[.]'"  *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021) (quoting *EPA v. Mink*, 410 U.S. 73, 87 (1973)).  It covers documents that are both predecisional and deliberative.  *See id.* at 785–86; *see also Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 512 (D.C. Cir. 2011).  "A document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made."  *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman Aircraft*, 421 U.S. 168, 184 (1975)).  "It is deliberative if 'it reflects the give-and-take of the consultative process.'"  *Am. Oversight v. U.S. Postal Serv.*, No. 20-cv-2580, 2021 WL 4355401, at *8 (D.D.C. Sept. 23, 2021) (quoting *Coastal States*, 617 F.2d at 866).  To meet its burden of showing this standard with reasonable specificity, an agency must generally provide "(1) the nature of the specific deliberative process involved, (2) the function and significance of the document in that process, and (3) the nature of the decisionmaking authority vested in the document's author and recipient."  *Hunton & Williams LLP v. U.S. Env't Prot. Agency*, 248 F. Supp. 3d 220, 243 (D.D.C. 2017); *see also Jud. Watch, Inc. v. U.S. Dep't. of Just.*, 20 F.4th 49, 57 (D.C. Cir.  2021) (holding that the agency did not meet its burden of showing the withheld material was deliberative because it did not adequately describe "the 'who,' 'what,' 'where,' and 'how' of the deliberative process and the role played by the withheld material").

DOJ also falls short of its burden for asserting the deliberative process privilege for these materials.  Categorical descriptions such as the one provided here will generally not satisfy an agency's burden for establishing this particular privilege because "the factual context

16

surrounding the withheld document is critical." *Nat'l Sec. Couns. v. C.I.A.*, 960 F. Supp. 2d 101, 189 (D.D.C. 2013). It is not enough to assert in a conclusory manner that the training material was predecisional. Rather, "a court must be able to pinpoint an agency decision or policy to which the document contributed" as well as "establish what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Senate of the Commonwealth of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Just.*, 823 F.2d 574, 585–86 (D.C. Cir. 1987) (cleaned up). Even if an eventual decision did not result, "an agency must show that the document was generated as part of a *definable* decision-making process." *100Reporters LLC v. U.S. Dep't of Just.*, 248 F. Supp. 3d 115, 151 (D.D.C. 2017) (cleaned up) (emphasis in original).

The deliberative process privilege does not usually extend to training materials because "training is not a step in making a decision; it is a way to disseminate a decision already made." *Am. Immigr. Council*, 905 F. Supp. 2d at 218 ("Indeed, by teaching USCIS employees to go forth and apply the information in the slides, USCIS entrenched its policies."). But even accepting that some of the documents may have been predecisional in the sense that they informed litigation strategies for which OIL-App attorneys retained discretion, they must also have been deliberative to qualify for the privilege. *See Vaughn*, 523 F.2d at 1144 ("[P]re-decisional materials are not exempt merely because they are pre-decisional; they must also be a part of the agency give-and-take of the deliberative process by which the decision itself is made.").

"[M]ere consideration of a document does not bring it within the privilege" unless the document itself "reflect[s] the give-and-take of the consultative process." *100Reporters LLC*, 248 F. Supp. 3d at 153 (cleaned up). "Rather, to come within the privilege and thus within Exemption 5, the document must be a direct part of the deliberative process in that it makes

recommendations or expresses opinions on legal or policy matters." *Vaughn*, 523 F.2d at 1143–

44. Accordingly, although give-and-take conversations may have occurred at the training, the

deliberative process privilege would only protect the withheld materials if the documents

themselves reflected that deliberative process. *See Trea Senior Citizens League v. U.S. Dep't of

State*, 923 F. Supp. 2d 55, 68 (D.D.C. 2013) ("Without a more detailed description . . . the Court

is unable to discern whether these documents 'reflect the give and take of the deliberative

process' or whether they are merely explanations or summaries of existing policy." (quotation

omitted)).

        The Court considers it unlikely that all of the prepared training documents such as

agendas, handouts, or slides themselves contain that type of iterative process. For example,

twelve videos were withheld in category 5, but DOJ does not state what information was

contained in the videos or whether they were prerecorded lectures—less likely to be

deliberative—or recordings of interactive trainings—which would be more likely to contain that

give-and-take element. As for the New Attorney training information described in Category 4,

by DOJ's description, the documents contain purely logistical instructions for new attorneys on

how to do things like track cases and hours and internal procedures to follow. Index at 4. There

is no indication of any "give-and-take" described here; much to the contrary, it appears to impart

set policies that new attorneys are expected to follow. "[A] document from a subordinate to a

superior official is more likely to be predecisional, while a document moving in the opposite

direction is more likely to contain instructions to staff explaining the reasons for a decision

already made." *Coastal States*, 617 F.2d at 868. DOJ has therefore failed to carry its burden that

all of these documents are protected by the deliberative process privilege.

3.  Attorney-Client Privilege

Finally, the attorney-client privilege protects confidential communications between an

attorney and a client.  *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 253 (D.C.

Cir. 1977).  It "protects only those disclosures necessary to obtain informed legal advice which

might not have been made absent the privilege." *Fisher v. United States*, 425 U.S. 391, 403

(1976).  "In the governmental context, the 'client' may be the agency and the attorney may be an

agency lawyer." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997).  To establish the

applicability of the attorney-client privilege, the agency must show that: "(1) the holder of the

privilege is . . . a client; (2) the person to whom the communication is made is a member of the

bar . . . and, in connection with the communication at issue, is acting in his or her capacity as a

lawyer; (3) the communication relates to a fact of which the attorney was informed by his client,

outside the presence of strangers, for the purpose of securing legal advice; and (4) the privilege

has been claimed by the client." *Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 841 F. Supp.

2d 142, 153–54 (D.D.C. 2012) (quoting *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C.Cir.1984)).

"[O]btaining or providing legal advice" must have been "one of the significant purposes of the

attorney-client communication," but it need not be the only purpose.  *In re Kellogg Brown &*

*Root, Inc.*, 756 F.3d 754, 760 (D.C. Cir. 2014).

Again, DOJ has not provided enough information for the Court to discern if attorney-

client privilege covers any of the various training documents.  To begin with, it is not clear that

"the holder of the privilege is . . . a client" in this context.  *Jud. Watch, Inc.*, 841 F. Supp. 2d at

153.  Although an agency may sometimes be a client, *Tax Analysts*, 117 F.3d at 618, here the

agency was training its attorneys rather than seeking guidance from the position of a client.  *See*

*Am. Immigr. Council*, 905 F. Supp. 2d at 223 (holding that "slides were used for general

19

trainings by USCIS lawyers" were not protected by the attorney client privilege because the agency "ha[d] not shown that the slides rest on its own confidential communications in the role of a client asking for legal advice").

Furthermore, the government does not show how the materials either were made in a legal advisory capacity nor how they were confidential. *See Mead Data Cent.*, 566 F.2d at 253. The training materials "are confidential only insofar as they rest on confidential information obtained from the client." *Am. Immigr. Council*, 905 F. Supp. 2d at 222–23. Analogy to the training slides at issue in *American Immigration Council* is again instructive. The court found that the attorney-client privilege did not cover those slides because they contained "generally applicable legal advice" and did not rest on "the factual particularities conveyed in a typical confidential communication by a client." *Id.* at 223. So too here, where the items described appear to be general descriptions of the law or hypotheticals designed to help the trainees understand the ever-shifting terrain of asylum law, not advice based on any confidentially communicated facts in a given case.

Again, the New Attorney Training materials described in Category 4 present an even clearer case than the substantive trainings. The agency is not communicating any legal advice or confidential facts to its new attorneys when instructing them on internal logistics for case management. *Cf. Heartland All. For Hum. Needs & Hum. Rts. v. U.S. Immigr. & Customs Enf't*, 406 F. Supp. 3d 90, 123–24 (D.D.C. 2019) (rejecting the contention that an operational plan memo attached to an email chain seeking legal advice was covered by the attorney-client privilege because the agency had not "establish[ed] that obtaining or providing legal advice was a primary purpose of including the attachment").

\*     \*     \*

"Where, as here, an agency's descriptions fail to affirmatively establish each of the essential elements of the claimed privilege, the district court has the discretion to order disclosure or to afford the agency an additional opportunity to fully discharge its burden." *Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 841 F. Supp. 2d 142, 155 (D.D.C. 2012).  Because it is plausible, and even likely, that some of the asserted privileges could apply to some of the documents, the Court will afford DOJ a second opportunity to discharge its burden by submitting evidence that more specifically describes which documents are being withheld pursuant to which asserted privileges and providing factual matter sufficient to establish the necessary elements for those privileges—and, with the benefit of the reasoning in this opinion, releasing or partially releasing any documents that were not properly withheld.

DOJ also asserted Exemption 6 for category 4 for "personal information, including internal DOJ email addresses not available to the public, and office locations[.]" Index at 4.  The Center does not contest DOJ's assertion of Exemption 6, and the documents can presumably be released in part with the protected information redacted.  DOJ may therefore continue to rely on Exemption 6 to withhold the described information if necessary but should indicate with specificity where and how it has done so on its next *Vaughn* Index.[7]

---

[7] Because the Court holds that DOJ has not met its burden of showing any of the privileges apply, it need not address DOJ's "foreseeable harm" justifications here.  However, it reminds DOJ that a non-cursory analysis of how "the agency reasonably foresees that disclosure would harm an interest protected by" each asserted privilege will be necessary to pass muster on its renewed motion for summary judgment. *See* 5 U.S.C. § 552(a)(8)(A)(i)(I); *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020) ("To withhold a responsive record, an agency must show both that the record falls within a FOIA exemption and that the agency reasonably foresees that disclosure would harm an interest protected by the exemption." (cleaned up)).

**C.  Count 4: Request for Studies and Analyses of the "Foreseeable Harm" Standard of the 2016 FOIA Improvement Act**

The Court turns next to the request at issue in Count 4, which was submitted in May 2020.  Def.'s St. Facts ¶ 13.  It was one of three very similar requests submitted by the Center to DOJ reflected in Counts 4–6, which were each sent to different sub-divisions of DOJ, requesting "studies, analyses, research, memoranda, information, instructions, reports, and documents" regarding the "foreseeable harm" standard imposed by Congress in the FOIA Improvement Act of 2016.  Ex. 4 of Compl.; *see also* FOIA Improvement Act of 2016, Pub. L. No. 114-185 (codified at 5 U.S.C. § 552(a)(8)(A)(i)(I)).  The other two requests not contested here were sent to DOJ's Office of Information Policy and Executive Office for U.S. Attorneys.  Def.'s Cross Mot. at 13.

The request in Count 4, the only one challenged by the Center, was processed by DOJ's Civil Division, which provided a final response to the Center in January 2021, advising it that no responsive records could be located.  Joint Status Report ¶ 7b (May 6, 2021).  The Center challenges the adequacy of that search, arguing that "[t]here must be records" because "[i]t is impossible that the Department of Justice did nothing in response to the new law."  Pl.'s Mot. at 11.  The Court is satisfied that DOJ has conducted an adequate search with respect to Count 4 and will grant partial summary judgment to DOJ on this issue.[8]

"[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."  *Jennings v. U.S. Dep't*

---

[8] DOJ initially argued that the Center's original request was "vague, overbroad, and improper under FOIA."  Def.'s Cross Mot. at 13.  However, it withdrew that argument in its Reply.  *See* Def.'s Reply at 6, n.2.  The Court likewise has "little doubt that, at least during the course of post-lawsuit negotiations . . . the [agency] determined the thrust of [the] FOIA request and what responsive records [it] possessed[,]" as demonstrated by the search it adequately conducted.  *Dale v. IRS*, 238 F. Supp. 2d 99, 105 (D.D.C. 2002).

*of Just.*, 230 F. App'x 1, 1 (D.C. Cir. 2007) (quoting *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)).  "An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Valencia–Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (cleaned up).  The agency must show that it "conduct[ed] a good faith, reasonable search of those systems of records likely to possess the requested records." *Pinson*, 177 F. Supp. 3d at 80 (quoting *Marino*, 993 F. Supp. 2d at 9 (internal citation omitted)).  To make this showing, an agency must submit a "reasonably detailed" affidavit setting forth the search terms and the type of search performed. *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  The burden then "shifts to the FOIA requester to produce countervailing evidence suggesting that a genuine dispute of material fact exists as to the adequacy of the search." *Dillon v. U.S. Dep't of Just.*, 444 F. Supp. 3d 67, 89 (D.D.C. 2020) (internal quotations omitted).

DOJ provided two declarations from Hirsh Kravitz, the Acting Director of FOIA and e-discovery at DOJ's Civil Division, describing how the agency searched for records in response to this request. *See* Kravitz Decl. ¶ 1; Supp. Kravitz Decl. ¶ 1.  Those declarations state that DOJ searched its "T drive," which "is where all cases, documents, records, guidance, and templates are maintained related to the processing of FOIA requests."  Kravitz Decl. ¶ 5.  It used the search terms "foreseeable harm" and "foreseeable harm standard," and did not limit the search by time period even though the request only asked for records from June 2015 to the date of the request. Supp. Kravitz Decl. ¶ 5.  Those terms, and that location, were "reasonably calculated" to uncover responsive records. *See Valencia–Lucena*, 180 F.3d at 325.

The Center does not actually object to the terms or the sources searched, rather, it argues that because the FOIA Improvement Act of 2016 changed the law when adding this standard, it

"must have provoked a response inside the Department of Justice," and that the failure to have created responsive documents is tantamount to an admission that DOJ ignored an act of Congress.  *See* Pl.'s Opp'n at 7–8.  This type of "[m]ere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them."  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991).

Furthermore, DOJ has supplied two perfectly reasonable explanations for why the Civil Division did not have any responsive records.  First, because OIP "is responsible for overseeing agency compliance with FOIA and developing government-wide policy guidance on all aspects of FOIA administration," Kravitz Decl. ¶ 5, it "was the appropriate entity" that would have responsive records, Def.'s St. Facts ¶ 16.  Second, "the foreseeable harm standard" was "actually created in 2009 [and] the FOIA Improvement Act of 2016 merely codified the already-existing DOJ standard," meaning that "the documents requested by Plaintiff . . . are outside of the time frame requested by Plaintiff" and in fact were publicly available online.  *Id.*

The Center remains incredulous because the imposition of the "foreseeable harm" standard in 2016 changed the burden of FOIA on agencies.  Pl.'s Opp'n at 7.  The codification of the foreseeable harm standard most certainly did change the burden of FOIA for the myriad federal agencies subject to it.  *See Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 371 (D.C. Cir. 2021) (criticizing the FBI because "very little about [its] declarations has changed despite passage of the FOIA Improvement Act and its foreseeability requirement").  But the standard adopted by Congress in 2016 had already originated with DOJ.  *See* 1 Guidebook to the Freedom of Information and Privacy Acts § 4:3 ("[T]he FOIA Improvement Act codified the Department of Justice's foreseeable harm standard . . . .").  The legislative history of the FOIA Improvement Act likewise makes clear that Congress

was codifying a standard that had been intermittently applied and withdrawn by prior administrations and had most recently been reinstated in 2009.  *See* S. Rep. 114-4, 114th Cong., 1st Sess. 2015, 2016 U.S.C.C.A.N. 321, 323 (Leg. Hist.) (tracing the foreseeable harm standard back to the Clinton administration and noting that "[c]odification of this policy also makes clear that FOIA, under any administration, should be approached with a presumption of openness"). The Court therefore finds no reason to doubt DOJ's assertion that its "analysis and guidelines regarding the foreseeable harm standard were actually created in 2009," thereby falling outside the scope of the request here.  Def.'s St. Facts ¶ 16.

## III.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (ECF No. 14) is **DENIED** and Defendant's Cross-Motion for Summary Judgment (ECF No. 17) is **GRANTED IN PART AND DENIED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  January 30, 2022                                  RUDOLPH CONTRERAS
                                                          United States District Judge